**MINUTE MAID CORPORATION,**
Appellant,

v.

**UNITED FOODS, INC., et al., Appellees.**
No. 18697.

United States Court of Appeals
Fifth Circuit.

May 30, 1961.

Rehearing Denied July 17, 1961.

**578**

William C. Garrett, Wilmer D. Masterson, III, Dallas, Tex., Kilgore & Kilgore, Dallas, Tex., for appellant.

H. T. Bowyer, Dallas, Tex., H. Fred Gober, Atlanta, Ga., Bowyer, Thomas, Crozier & Harris, Dallas, Tex., for appellee, United States Cold Storage Corp.

Before TUTTLE, Chief Judge, and HUTCHESON and BROWN, Circuit Judges.

TUTTLE, Chief Judge.

This is an appeal from a judgment of the trial court, sitting without a jury, denying a recovery from United States Cold Storage Corporation by the appellant for the purchase price of commodities sold by it to the United Foods, Inc.

Appellant's theory of recovery was that United Foods, Inc., a direct purchaser from it, was engaged in a partnership operation with the Cold Storage Corporation, thus making Cold Storage liable for the unpaid purchase price.

There is no dispute about the fact that United Foods was indebted to Minute Maid Corporation in the sum of $143,-141.66, representing the purchase price of frozen food products sold to United. The question whether Cold Storage is equally liable for this sum must be answered in the light of the following history of the relationship between the parties: Commencing November 1, 1956, United Foods was an authorized direct buyer of products packaged by Minute Maid; Minute Maid's terms of sale for retail size packages to authorized direct buyers, such as United Foods, included discounts based upon the volume of goods included in a single order, which discounts were generally referred to as "quantity allowances" or "freight allowances," or described in the price list as "truckload storage allowances" and "carload storage allowances"; Minute Maid stored a substantial amount of frozen foods in Dallas, Texas, through arrangements with United Foods, paying United Foods at the rate of 20 cents per hundredweight for such storage; at all times pertinent to this action Cold Storage owned and operated a cold storage warehouse in Dallas, Texas.

United Foods did not have the financial ability from its own resources plus normal credit sources to finance the carrying of a large inventory of frozen food products; that means that there were certain substantial price benefits that it could not get; Cold Storage did have and was willing to make funds available to assist United Foods in buying Minute Maid products in quantities that permitted the maximum discounts; the market conditions affecting frozen food products are such that the price of such goods tends to rise from the month of May to the end of the year, and such increases in

price as to citrus food products is as high as 50% in years when weather conditions adversely affect citrus production; at all times pertinent to this action a direct buyer of frozen foods products, such as United Foods, was protected against price declines to the extent of inventories representing goods received during the last thirty day period; United Foods, without the knowledge of Minute Maid, operated so as to obtain an additional thirty days protection against price declines by taking goods owned by Minute Maid from warehouses approximately thirty days prior to notifying Minute Maid of the withdrawal. The effect of this relationship made it possible for a direct buyer, by buying large quantities, to profit as much as 50% on inventories by receiving notice from Minute Maid of proposed price increases a considerable time in advance of the price increase, whereas there was practically no risk of a loss on such inventories by reason of the sixty days protection against price declines above referred to. It is undisputed that this made peculiarly attractive the speculation in inventories.

On May 1, 1957, United Foods and Cold Storage entered into an agreement which spelled out their relationship with each other. Since we conclude that the essential question presented by this appeal must be resolved by reference to this written agreement we consider it essential to print the relevant portions of it in full as follows:

"Memorandum of Agreement
"May 1, 1957

"Between—United Foods, Inc., referred to as United and United States Cold Storage Corporation, referred to as U. S.

"United is a broker of frozen foods in the Dallas, Texas, Area;

"U. S. operates cold storage plants at Dallas and Fort Worth, and will extend finance services to United on the following basis:

"1. Staple commodities bought by United, stored in U. S. plants, will be the collateral if acceptable to U. S., together with acceptable (to U. S.) accounts receivable resulting from sales of the commodities, for loans to be made by U. S. The aggregate amount of loans outstanding at both plants, taken together, shall not exceed $300,000.00.

"2. The amount of loan to United on any lot of product shall be United's gross cost delivered to the warehouse of U. S. The amount of the loan on any of United accounts receivable shall be the amount of the invoices.

"3. Notes to U. S. shall be given by United for each loan and shall bear interest at 6% until paid.

"4. Notes for loans on commodities shall be paid when product is ordered from warehouse.

"5. Notes for loans on accounts receivable shall be paid to U. S. by endorsement of check received from customer to U. S. provided that United will itself pay U. S. for any invoices not otherwise paid in 45 days from date of invoice.

"6. Warehouse charges on staple product on which loans are made on these terms shall be 15¢/100 lbs. handling and 12½¢/100 lbs. per month storage, based on the gross weight of package and contents, and a lot delivery charge of 50¢ as current at each plant. Interest, interest service charges and insurance charges shall be at the rates current at each plant. Tariff rates will apply on all other products stored.

"7. All warehouse, interest and insurance charges shall be billed by U. S. monthly, and charged to the "Special Account" described below.

"8. The "Special Account" on the books of U. S. is to be set up to accumulate charges as set forth in Paragraph 7 and to accumulate credits as follows:

"a. United shall pay to U. S. the 6¢ per dozen packer allowance on retail merchandise or any other quantity allowance, advertising, freight, allowance, incentive and profit to the Special Account;

"b. United shall pay to U. S. for the Special Account the incentive from any packer special proposals, as for instance, in forward buying, in anticipa-

ting of a price raise, or other inducements to move special product items, such as fish, shrimp, poultry and the like;

"c. United is paid 20¢/100 lbs./month by Minute Maid on institutional merchandise and this allowance will be paid to U. S. for the Special Account to which also U. S. will debit the warehouse charges on this product;

"d. If United shall charge any of its suppliers or customers for storage at a higher rate than U. S. is charging United therefor, the excess shall be paid (upon collection) by United to U. S. for credit to the Special Account.

"e. If the amount of any United invoice pledged as an account receivable exceeds the amount of loan on the commodity so invoiced, United shall pay the excess to U. S. for credit to the Special Account.

"9. At the end of the calendar year, the Special Account shall be closed, and

"a. If there is a credit balance, ½ thereof shall be paid by U. S. to United within 20 days and the remainder shall be retained by U. S. as its property.

"b. If there is a debit balance, U. S. shall so notify United, who will pay U. S. ½ of the amount of such debit balance within 20 days of notification.

"10. Conditions of pledge of accounts receivable shall be—

"a. That the customer billed is acceptable to U. S. as to credit.

"b. That United furnishes U. S. two copies of the invoice endorsed with a pledge to U. S. signed by proper officer of United.

"c. That United endorse to U. S. the checks received from debtors whose invoices have been pledged.

"d. U. S. shall permit a representative of U. S. to inspect United's record of accounts receivable upon request of U. S.

"11. In case of pending price increase, U. S. and United may agree on the volume to be purchased by United, and U. S. will loan, upon receipt of product in storage, the cost to United. When the price increase is effective, U. S. will loan United an additional amount equivalent to the price increase, and such amount shall be paid by United to U. S. for credit to the Special Account, as set forth in Paragraph 8 b.

"12. This agreement shall terminate January 1, 1958, but may be extended by written agreement of the parties hereto."

On June 24, 1957, the foregoing agreement was amended only to the extent of providing that instead of $300,000 the aggregate amount of loans outstanding was increased to $500,000.

All of the sales for which the purchase price is here in litigation were made while this contract was in effect. Subsequently, on December 9, 1957, at which time there was a credit balance of approximately $22,000 in the "special account," referred to in the contract, the parties entered into a termination agreement terminating the contract effective December 31, 1957. This contract further provides:

"Any amounts due by United States Cold Storage Corporation to United Foods, Inc. under said contract and the provisions of paragraph nine thereof shall be retained by United States Cold Storage Corporation to apply against future storage and financing charges that may accrue on products stored with them by United Foods, Inc."

United Foods, as a food broker engaged in the business of selling Minute Maid products, and during the year 1957 handled in excess of $1,000,000 of these products. This business was carried on by United Foods at its own office, with its own employees, and at its own expense.

During the life of the contract, Cold Storage did advance 100% of the invoice price of Minute Maid products purchased and stored by United Foods in Cold Storage's warehouse; and United Foods deposited in the "special account" all of the allowances referred to in the written contract. This account, which was held by Cold Storage, paid Cold Storage interest at 6% on all advances and paid

its warehouse and insurance charges monthly. At the end of the year the profits from the accumulated credits exceeded these expenses by some $22,000.

Minute Maid did not know of the relationship between United Foods and Cold Storage. It does not contend that it was misled into extending credit to United by reason of such relationship. It contends that the agreement between the parties and the course of dealing thereunder created a partnership relationship between United and Cold Storage and that Cold Storage became liable with United Foods for all debts of the partnership. Minute Maid distinguishes between the regular sales business of United Foods in selling Minute Maid products to the trade from what it considers to be the subject of the partnership. It says that the partnership consisted of a joint endeavor by United Foods and Cold Storage under which United Foods would take advantage of its position as a direct purchaser of Minute Maid products and of the financing afforded it by Cold Storage to buy products in the quantities that would yield the greatest amount in allowances and discounts and if the market appeared right, to speculate on a possible price increase; that in return for Cold Storage's agreement to finance the transaction to the extent of advancing 100% of the purchase price of the products it would store the products in Cold Storage's warehouse at a profitable rate, it would pay interest of 6% on all advances and it and Cold Storage would share equally the profits that could thus be anticipated from the discounts and from profitable speculation, if indulged in.

Cold Storage, on the other hand, contends that the agreement created only a relationship at most of debtor and creditor between it and United, or that the relationship was an ambiguous one which the trial court, on disputed evidence, found as a fact not to be a partnership.

The essential facts are not in dispute. A decision, therefore, whether the relationship shown by the undisputed facts to exist, constituted a partnership or only that of debtor and creditor is one for the court to make as a matter of law. We thus approach the question not as a reviewer of the facts, but to determine whether the trial court properly applied the law to the facts.

A critical examination of the foregoing facts, most of which are made the basis of formal findings by the trial court, necessarily leads to the following conclusions:

(1) Cold Storage was to be repaid the principal amount of its advances to United regardless of the success or failure of the enterprise.

(2) Cold Storage was to receive its warehouse charges, its interest at 6% and reimbursement for the cost of insurance out of the "special fund" set up under the contract. It seems plain that there could be no failure of the special fund to provide sufficient sums to meet these obligations and provide a profit, because the parties could in advance know exactly how much by way of special allowances and discounts would be paid into the special fund, and, of course, the charges would bear a direct relation to these same items. However, if there was a deficit in this special fund, it was to be shared by the parties equally.

(3) The advance of 100% of the invoice price of the merchandise was not a normal credit arrangement which would be available to United by the payment of legal rates of interest.

(4) Both United and Cold Storage would profit by increasing the purchases of United made possible by the arrangement between the two parties. United's profit would come from its 50% participation in the profits in the special fund and Cold Storage's profit would come from the increasing of the inventory for which it received substantial warehouse fees, an increase in inventories for which it received its 6% interest and the anticipated profit arising by reason of the fact that it could be computed in advance that the special allowances and discounts paid into the fund would exceed the carrying

charges. Cold Storage became the owner of one half of this excess.

(5) Cold Storage was undoubtedly in the relation of a creditor of United; it was also in the relation of a bailee for hire.

(6) It is also clear, however, that the operation that here produced the sale of the volume of Minute Maid products to United would not have occurred by reason of Cold Storage's willingness to engage in either or both of these two activities standing alone, and on normal terms—that is as a creditor receiving a legal rate of interest and a warehouseman receiving its stated warehouse charges.

(7) It is plain that Cold Storage was interested in assisting United to create a larger indebtedness on which it would receive its interest and a larger volume of inventory on which it would receive its warehouseman's fees and that in order to assist in creating this larger volume of business for itself it participated with United in making possible the larger purchases of Minute Maid products than United could otherwise have accomplished.

Does this analysis cause us to conclude that the two parties, acting to their mutual interest to make possible an increased purchase of Minute Maid products, created a joint venture or partnership between them?

■ Basically the parties do not disagree as to what constitutes a partnership under the law of Texas. Appellant points to the case of Thompson v. Schmitt, 115 Tex. 53, 274 S.W. 554, 557, in which the Texas Supreme Court said:

"There is no substantial difference between the rule in Texas and that announced in Meehan v. Valentine, 145 U.S. 611, 623, 12 S.Ct. 972, 975, 36 L.Ed. 835, in these words:

" 'In the present state of the law upon this subject, it may perhaps be doubted whether any more precise general rule can be laid down than, as indicated at the beginning of this opinion, that those persons are partners who contribute either property or money to carry a joint business for their common benefit, and who own and share the profits thereof in certain proportions. If they do this, the incidents or consequences follow that the acts of one in conducting the partnership business are the acts of all, that each is agent for the firm and for the other partners, that each receives part of the profits as profits, and takes part of the fund to which the creditors of the partnership have a right to look for the payment of their debts, that all are liable as partners upon contracts made by any of them with third persons within the scope of the partnership business, and that even an express stipulation between them that one shall not be so liable, though good between themselves, is ineffectual as against third persons. And participating in profits is presumptive, but not conclusive, evidence of partnership.' "

Although the appellee does not undertake to set out in express terms its understanding of what the Texas law is on the creation of a partnership in abstract terms, preferring rather to seek to point out the absence of certain criteria, which it contends are essential to a finding of a partnership, it clearly implies its agreement with the definition set out above. It does so by itself, relying upon Meehan v. Valentine, 145 U.S. 611, 12 S.Ct. 972, 36 L.Ed. 835, referred to in the Thompson case, supra, and Fink v. Brown, Tex. Com.App., 215 S.W. 846, which gives substantially the same definition, and by its own statement in brief that "there must be evidence 'of a joining between appellant and [United] in a common business to be operated for their joint account in which each as owner had an interest which would entitle them to share as principals in the profits.' " This statement by appellee is, of course, a paraphrase of the definition taken from the Meehan case.

We take it, therefore, to be the law of Texas that if the parties entered into a contract from which it is clear that the parties contemplated joining in a common business for their common benefit to be operated for their joint account and in which they as owners each of an interest would be entitled to share as principals in the profits as such, they would be partners. See Fink v. Brown, Tex.Com.App., 215 S.W. 846, cited both by appellant and appellee as defining the relationship.

Appellee is too preoccupied, we think, with its insistence that the relationship between United and Cold Storage was that of debtor and creditor. This is undoubtedly correct, but it is equally undoubtedly indecisive. Appellee also relies strongly on the contention that there was no express obligation assumed under the written contract whereby Cold Storage was to share in the overall losses of the enterprise. This, of course, is the very question that this Court has to decide, for if the relationship between the parties constituted them partners, then the law imposes upon them the obligation to pay the losses. No case has been cited from Texas or elsewhere to the effect that the mere failure to agree in the formal contract that the parties will share the losses prevents the relationship from being that of partners. To the contrary, Thompson and Schmitt, supra, expressly stands for the proposition that "even an express stipulation between them that one should not be so liable, though good between themselves, is ineffectual as against third persons." (quoting Meehan v. Valentine, 145 U.S. 623, 12 S.Ct. 975.)

It is the burden of appellee's argument here that if there is nothing more than a lender relationship, coupled with an agreement that compensation for the loan is to be in the form of a sharing in profits, either in lieu of or in addition to normal interest, these facts are sufficient to rebut the presumption that arises by the profit sharing agreement. Appellee contends that additional indicia of an intent to create a partnership must be shown either in the nature of joint control by the person sought to be bound as a partner, or an express agreement to share in losses.

Assuming this position to be correct, we think it is undeniably true here that control over the particular enterprise in which these two parties were engaged was jointly held by United and Cold Storage. We must bear in mind exactly what this enterprise was. It was not the commission food business carried on by United. It was the arrangement whereby Cold Storage furnished the financing and warehouse facilities to make possible United's use of its relationship as a direct buyer of Minute Maid products in such quantities and under such terms as would turn a profit for both of them. There can be no question but that the parties had joint control over this enterprise. This follows from the fact that United initially determined how much to buy but such determination was subject to Cold Storage's right to determine whether the proposed collateral would be "acceptable." Also, it was provided that in case of pending price increases, which the court found would offer the opportunity to speculate on inventory, the parties would agree on the volume to be purchased. In point of fact the responsible officer for United testified that, "they [Cold Storage] could have stepped in and written me [United] off pretty damned fast."

Appellee argues that the retention of warehouse receipts by Cold Storage in its name as joint depositor and the assignment of invoices to it for its protection were normal security measures taken by the lender on a warehouse stock. This, it seems to us, misses the whole point. Whether or not such security measures amounted by themselves to "control" of the partnership affairs, we think the operation heretofore outlined was clearly within the joint control of the parties.

Finally, appellee urges that this Court should find that the Texas law has changed and that there should no longer be a distinction between what constitutes a partnership as between the parties

584

themselves on the one hand, and as to third parties on the other. In effect appellee is urging that we should find that the uniform partnership act, heretofore adopted in several states, is now the law of Texas, notwithstanding the refusal of the Legislature of that state to adopt it. Such an argument, of course, has no place in a discussion of what the law is under the Texas decisions.

We conclude that the relationship established by the written contract of the parties and by their conduct thereunder constituted a legal partnership or joint enterprise under the Texas law.

■ Appellant alleges error in the failure of the final judgment below to include interest from the date of the sworn account. It points out that the trial court, in its conclusions, found appellant was entitled to interest against United from January 1, 1958, whereas the final judgment allows interest only from the date of judgment. Appellee makes no response to this contention. We conclude, therefore, that the judgment against United should be in accordance with the trial court's conclusion above referred to.

Appellant argues here that under a stipulation between the parties it is now entitled to a separate hearing as to an attorneys' fee to be recovered from appellee. There is nothing in the judgment touching on this matter, and there is, therefore, nothing to appeal from. If such stipulation is in effect between the parties, it is a matter to be brought upon remand to the attention of the trial court.

The judgment of the trial court is, reversed and the case is remanded to the trial court for further proceedings not inconsistent with this opinion.

JOSEPH C. HUTCHESON, Circuit Judge (dissenting).

As I read the opinion of the majority, I have no quarrel with its statement of the facts of this case. I think, though, its conclusion that there was a partnership between United States Cold Storage Corporation and United Foods, Inc. and

that the district judge, in holding and adjudging the contrary, was wrong, is a complete non sequitur. It seems indisputable to me under the facts as found by the district judge, indeed under the undisputed facts, that there is no basis for finding a partnership, and, therefore, for setting aside and reversing the judgment of the district court.

Read the facts as set out in the district court's findings and in the majority opinion as one will, there is, in my opinion, no basis for any other finding and judgment than that the district judge gave. In short, this is just another "partnership" label case in which the question of partnership vel non is debated in artificial terms, with the result that the debater, here the majority, is led by a technical definition to apply a certain name and then to deduce consequences which have no relation to the grounds on which the name or label "partnership" could properly be applied. Batman v. Commissioner, 5 Cir., 189 F.2d 107. Cf. Guy v. Donald, 203 U.S. 399, 27 S.Ct. 63, 51 L.Ed. 245.

In support of this view, I put forward three positive reasons, not only sustained but required, by the record and the law of partnership.

The first is that the question of whether or not a partnership is created depends entirely upon the intent, of the parties to the agreement, to create a partnership, 32 Tex.Jur., "Partnership", Sec. 13, 233; Luling Oil & Gas v. Humble Oil & Refining Co., 144 Tex. 475, 191 S.W.2d 716. Cf. U. S. Truck Lines v. Texaco, Inc., Tex.Civ.App., 337 S.W.2d 497; not, however, their secret subjective intent but the intent manifested in what they agreed to, and did, do. Here there was no such indication whatever of such an intent on the part of either United States Cold Storage or United Foods, Inc.

Second, in Texas it is settled law that "In order for there to be a partnership, the parties must not only participate in the profits but *they must have an interest in the profits, as profits, and share*

*them as joint owners or principals of the business or venture, as distinguished from having an interest therein as compensation under a profit sharing agreement."* (emphasis added). LeBus v. LeBus, Tex.Civ.App., 269 S.W.2d 506, 511. Here there was no agreement between United States Cold Storage and United Foods, Inc., that they should go into any kind of business together to share the profit thereof. The agreement was specifically that the United States Cold Storage, in connection with its warehousing business would lend money to United Foods and the money loaned would be paid back to United States Cold Storage at all events, primarily out of the special account provided for in the agreement, if there was accumulated enough in it to pay it, with the further understanding, however, that there was a chance that after the loan, with interest, was paid back by United Foods, there would be additional compensation to United States Cold Storage out of one-half of the special account, if there was a balance left in it after paying the proper expenses chargeable against it.

Third, a separate and insuperable ground against finding a partnership in this case is that, in Texas, corporations may not enter into partnerships, 32 Tex. Jur., "Partnership", Sec. 25, and, while there have been cases where a corporation has been held estopped to plead ultra vires, under the general principle disqualifying corporations from being partners, the finding and conclusion, that they intended to be, and took some action which made them, partners, would be legally inconceivable since it would find an intent to do something forbidden by, and contrary to law, and there are no facts whatever to support such a finding.

But over and above these three insurmountable obstacles, there is the added one that, except in a case of estoppel or a holding out, a court should not strain, through a finding of partnership, to hold a person, who did not contract a debt, liable for it.

In my opinion the findings and conclusions of the district judge, a long

time Texas lawyer of wide business and legal experience, correctly set out the facts and the legal principles governing here, and I concur fully in his findings and conclusions. I, therefore, dissent from the contrary conclusions of the majority opinion, that there was a partnership.

I respectfully dissent.

On Petition for Rehearing.

PER CURIAM.

The motion for rehearing points out that, after this case was argued and submitted to the Court, to-wit, on May 16, 1961, the Legislature of the State of Texas enacted the Uniform Partnership Act, contrary to the statement contained in our opinion dated May 30, 1961.

The section mentioned in the Uniform Partnership Act did not in any way enter into our consideration of this case on the merits. We concluded that the undisputed dealings and relationship between the parties created the relationship of partners under applicable Texas decisions. Nevertheless, in the interest of accuracy, we strike the following paragraph from the opinion:

"Finally, appellee urges that this Court should find that the Texas law has changed and that there should no longer be a distinction between what constitutes a partnership as between the parties themselves on the one hand, and as to third parties on the other. In effect appellee is urging that we should find that the uniform partnership act, heretofore adopted in several states, is now the law of Texas, notwithstanding the refusal of the Legislature of that state to adopt it. Such an argument, of course, has no place in a discussion of what the law is under the Texas decisions."

■ Appellees now, for the first time on appeal, contend that corporations cannot legally stand as partners in relation to each other in Texas. This point was not alluded to in the original brief and was not presented to the Court

in oral argument. It cannot now be raised for the first time by motion for rehearing.

The motion for rehearing is denied.

JOSEPH C. HUTCHESON, Circuit Judge, dissents.