## LE BUS  v.  LE BUS et al.

### No. 15510.

Court of Civil Appeals of Texas.

Fort Worth.

April 30, 1954.

Rehearing Denied June 11, 1954.

Ben W. Tipton, Jr., Fort Worth, Mc-Donald & Anderson, C. C. McDonald, Wichita Falls, for appellant.

Tipps, Masters & McCormick, O. R. Tipps, Wichita Falls, for appellees.

MASSEY, Chief Justice.

From a summary judgment rendered for the defendants in a suit against them to impress a trust upon funds recovered as profits from operation of a certain oil and gas lease, and for an accounting of such funds, the plaintiff appealed.

Judgment reversed and the cause remanded for a trial on the merits.

The suit was initiated in March of 1953 by Ervin C. LeBus, who was the executor of the estate of John E. LeBus, deceased and who died in November of 1952. His suit was premised upon his allegation of certain rights having been in existence in his father at the date of his death, and to enforce the same as of the date of death. The rights sued upon were founded in a transaction of October, 1937, as result of which the lease known as the Mangold lease in Wichita County, Texas, was acquired in the name of George F. LeBus. The original parties to the transaction were the deceased and a brother of the deceased, George F. LeBus. Subsequently, George F. LeBus' interest in the oil and gas properties involved in the suit was transferred, at least in part, to his sons, Roy H. LeBus and George F. LeBus, Jr. All three persons were named as defendants, but since George F. LeBus' sons' interest in the suit has resulted simply by reason of transactions between them and their father and since their interest is identical with that of the father, our discussion in this opinion is simplified by treating the executor as one party and George F. LeBus as the other.

The defendants filed a motion for summary judgment and upon a hearing the trial court sustained the defendants' motion and rendered a take nothing judgment in favor of the defendants, and the plaintiff appealed.

George F. LeBus and his brother John, now deceased, were indisputably partners, in so far as partnership in a mining partnership is concerned, in connection with several operations, both prior and subsequent to October of 1937 when the Man•

gold lease was acquired in the name of George F. LeBus. Indeed, it was through information acquired pursuant to the operations under one of these mining partnership situations that the desirability of the Mangold lease was discovered. The brothers were jointly drilling on a neighboring lease in which they each owned a proportionate interest, and as to which the other attributes of a mining partnership existed between them, when they learned as a result of the operations that they were about to bring in an oil well thereon. This information directly occasioned the acts resulting in the acquisition of the neighboring Mangold lease.

While not certain, it appears probable that George F. LeBus was the only one of the two brothers who had the money to buy in the Mangold lease. His brother was fully informed as to the desirability of acquiring such lease but was financially unable to put up any proportionate part of the cost of acquisition, or of any operations thereon after acquisition. There was no lack of good faith on the part of either brother and each was in a position of full compliance with all the duties incumbent upon him as result of the trust relationship which existed between them. It was simply a situation where George F. LeBus was in a position financially to take advantage of the knowledge which was the property of both himself and his brother, but his brother was not.

In view of this circumstance the two brothers entered into an oral contract concerning the Mangold lease. According to the appellant this agreement involved a purchase of the Mangold lease by George F. LeBus, and in connection with the purchase his brother John E. LeBus acted as his agent and servant in making the approach to the owners of the Mangold lease, establishing a favorable relationship, suggesting a purchase, negotiating the consideration, and effecting a close of the transaction whereby the prior owners conveyed the legal and equitable title to the lease property to George F. LeBus. As consideration to John E. LeBus for performance of these services George F. LeBus made certain promises to him, conditioned upon such transaction proving profitable. The condition was actually twofold. Firstly, in the event of a resale of the Mangold lease John E. LeBus was promised one-fourth of the net profit, if any, resulting from the resale. Secondly, in the event of operations upon the Mangold lease, John E. LeBus was promised one-fourth of the net profit, if any, resulting from the operations. Under this secondary situation, there was an agreement that John E. LeBus' entitlement should not begin until George F. LeBus had reimbursed himself all the amount that he expended in acquiring the lease plus all his expenses in connection with operations conducted thereon, after which the one-fourth would be payable to his brother periodically and after computation of the net profits. There was no time limit stated during which George F. LeBus would be obligated to pay the consideration so agreed upon and during which John E. LeBus would be entitled to receive the same.

With this contention as a premise, appellant contends that the Mangold lease was not resold, but was in fact retained by George F. LeBus and was operated by him and successful drilling operations were conducted thereon, and production of oil and gas in paying quantities was realized from said operations with such great success that during the period from the time the lease was acquired in 1937 to the time of John E. LeBus' death in November of 1952, a net profit for such period would exceed one million dollars. During such period it is undisputed that George F. LeBus and John E. LeBus were mining partners in so far as various other enterprises were concerned, and George F. LeBus was engaged in other and more extensive enterprises in which he was in mining partnership with other persons than John E. LeBus. In part, at least, because of George F. LeBus' more extensive and more highly involved activities he maintained a business office, and he kept books and records, while John E. LeBus did not maintain a business office and did not keep books and records. George F. LeBus kept all the records of the activities in which he was engaged in

which John E. LeBus had an interest. It was his custom to remit to John E. LeBus from time to time payments due him as his part of profits from their joint activities. By appellant's pleadings, at least at one stage, he admits that George F. LeBus did properly compute all the profits due his brother, and did pay to him all such profits to and including the month of November, 1952, during which month John E. LeBus died, save and except the amount in money which George F. LeBus justly owed his brother John E. LeBus because of the oral agreement made with him concerning the one-fourth of the net profits from the Mangold lease.

Appellant alleged that John E. LeBus, as result of the relationship with George F. LeBus and because of the fact that George F. LeBus was keeping the books and remitting such profits to him as he was entitled under the various agreements and relationships with him in and to various operations, never did know even until the date of his death that he was not receiving the money he was entitled to receive under the agreement and oral contract of October, 1937, pursuant to which he had fully performed his obligation by obtaining the Mangold lease for George F. LeBus. On the contrary, according to the allegations or the appellant, John E. LeBus was misled because of the fiduciary relationship, and additionally during the last five years of his life because of the fact that he was mentally incompetent as result of his addiction to alcohol and drugs, into believing that George F. LeBus was in fact paying him the profits due him under the contract, and was keeping the account thereon current by regular payments of amounts due because thereof.

Appellant alleges further that contrary to the understanding and belief on the part of John E. LeBus during the entire period from October, 1937, to date of his death, he had not been paid one cent pursuant to the oral contract and agreement in question, whereby the total amount accrued under and by reason of the said agreement and due him as indebtedness because thereof was in excess of the sum of $250,000. The appellant's suit is to establish the contract, and to establish by an accounting the amount of the indebtedness due the estate of John E. LeBus as of the date of his death in November of 1952, and to impress an equitable lien upon all the partnership properties still owned by the estate of said deceased along with George F. LeBus and the other appellees, as security for the payment of the debt so accrued.

Pursuant to his suit in this regard the appellant alleged that immediately upon the acquisition of the Mangold lease, George F. LeBus set out to defraud John E. LeBus and to deprive him of any benefits accruing under the agreement and contract of October, 1937, and that pursuant to such fraudulent purpose George F. LeBus did lead him to believe that he was receiving the money due him under and by virtue of said contract and agreement, when in fact he was receiving nothing thereunder. Further allegations were to the effect that the other appellees did likewise and participated in the fraud.

It is true that in order to resolve the effect of the appellant's pleadings into allegations set out by us as our understanding of them, some difficulty was experienced. This difficulty arose because the pleadings primarily proceed on the premise that the agreement made between John E. LeBus and George F. LeBus in 1937 created a partnership relationship between the two upon the Mangold lease. However, this is deemed by us to be a conclusion on the part of the pleader from facts which he plead sufficiently for us to contrarily conclude as a matter of law that it was a contract for personal services and that the consideration for the performance of his part of the contract by John E. LeBus was the agreement by George F. LeBus to pay him a compensation for such personal services, the measure of the compensation to be one-fourth of the net profits from operations conducted on the Mangold lease by George F. LeBus. Though appellant calls the relationship he says was created by the agreement a "partnership" throughout his pleadings, nevertheless we are of the

opinion that from the facts he alleges that he has applied a misnomer through an erroneous conclusion and that as applied to the relationship which resulted under his allegations of fact, such was not a partnership relation, though it was one of trust.

The appellant in his pleadings also appears to have concluded that as result of the agreement and deceased was to have been paid one-fourth of the net profits, though it is our construction of the oral contract as pleaded that one-fourth of the net profits was merely a "yardstick" by which the compensation deceased was to have been paid should be measured.

Appellees' brief and pleadings treat the suit of appellant as one to establish an interest by way of an equitable title in and to the Mangold lease, but the appellant disclaims any such attempt on his part and expressly states that he does not have any right to any title, legal or equitable, in said property, and that his only purpose by his suit is to collect an indebtedness rightfully due John E. LeBus as of date of his death under and by virtue of the oral agreement and contract in question, and in view of the death of John E. LeBus now due and owing to his estate. There are various exhibits which are written contracts relating to the Mangold lease and which bear the signature of the deceased, and which either disclaim title or otherwise demonstrate that said deceased never did claim any interest in the legal or equitable title to the Mangold lease. To say the least, in so far as we consider the proceedings from the standpoint of a summary judgment proceeding, we cannot say that it was ever established that the deceased ever claimed an interest in the title which could have been a premise of his claim, and which he disposed of by any action prior to the date of his death. So we cannot hold that the deceased ever released his claim, if any he ever had. Neither can any of said instruments premise any legal holding that any of the statutes of limitation are applicable to the case.

The only manner in which a statute of limitation might defeat the appellant's suit would be upon its being established that at some certain date the deceased either knew, or in the exercise of ordinary care should have known, that he had not received some payment accrued and due and unpaid under and by virtue of the agreement and contract of 1937, and from which date we could compute some time covered by a statute of limitation. 28 Tex.Jur., p. 125, sec. 44. No proof bearing upon this knowledge or notice was introduced upon the hearing of the motion for summary judgment.

■■■ George F. LeBus having taken the Mangold lease, he took both title and ownership of the oil and gas in place and the license for the purpose of exploration and production of such minerals on and under the surface. John E. LeBus got neither, and neither did he get and interest in either. The only title that the owners of real estate in Texas have is a fee simple, and conversely, those who have the fee-simple title, and those only, are the owners of the land. Scogin v. Perry, Sup.Ct.1869, 32 Tex. 21, 22. John E. LeBus was not a cotenant with George F. LeBus in and to the Mangold lease because he was never entitled to any possession thereof or therein, and never having been so entitled there could have been no tenancy therein common to them. 11 Tex.Jur., p. 410, sec. 2. The four requisites of any estate in joint tenancy never existed simultaneously or concurrently between the two brothers in the Mangold lease. These requisites are: unity of interest, unity of title, unity of time, and unity of possession. 11 Tex.Jur., p. 412, sec. 4. Though there may legally be a partnership of some kind relating to oil and gas or oil and gas lands which is not a mining partnership, it is certain that the brothers could not have been mining partners in relation to the Mangold lease for there was never contemplated or possible any joint working as well as joint ownership of the lease. These are essential to such a relationship. 32 Tex.Jur., p. 218, sec. 2.

■■■ Under the appellant's theory, John E. LeBus' interest in the profits would be in common with George F. LeBus' inter-

est therein. But the ownership, or seizure, of the profits as they accrued was not common because John E. LeBus did not have the right, as an owner of an interest in such profits, to dispose of what he owned. George F. LeBus retained absolute control of the operations on the property, and the possession of the property. We believe John E. LeBus had only a contractual right to have his share of the profits paid over to him when they were earned. If the interest in the profits is joint, then that generally makes it a partnership, but a common interest in the profits does not. If the interest in the profits is that of an owner, if there be a joint seizure, if the parties each have the right, as such owners, to dispose of the profits, then there is a partnership. If one may dispose of or control the profits as much as the other, then there is a joint interest, but if one party's interest be only a common interest in the profits, that is, if he have no title jointly with the other party with the right to control as owner over the profits, but, with only a common interest in them because the profits measure what amount he shall receive for the services or property contributed by him, then he is not a partner. Municipal Paving Co. v. Herring, Sup.Ct.1915, 50 Okl. 470, 150 P. 1067. In order for there to be a partnership the parties must not only participate in the profits but they must have an interest in the profits, as profits, and share them as joint owners or principals of the business or venture, as distinguished from an interest therein as compensation under a profit sharing agreement. Tanner v. Drake, Tex.Civ.App., Eastland, 1932, 47 S.W.2d 452, affirmed in Tex.Com.App.1935, 124 Tex. 395, 78 S.W.2d 162; Mangum v. Turner, Tex.Civ.App., Amarillo, 1940, 142 S.W.2d 951, error dismissed; Pyron v. Brownfield, Tex.Civ.App., Amarillo, 1922, 238 S.W. 725; Buzard v. Bank of Greenville, Sup.Ct.1886, 67 Tex. 83, 2 S.W. 54, 60 Am.Rep. 7; Storey on Partnership, sec. 33, et seq.; Rowley on Modern Law of Partnership, p. 65, sec. 69, et seq.; 47 C.J., p. 669, sec. 62; 68 C.J.S., Partnership, § 17, p. 428; 32 Tex.Jur., p. 228, sec. 8, and p. 240, sec. 18.

■ John E. LeBus was not to receive one-fourth of the net profits from operations on the Mangold lease as a principal. The agreement was alleged to have fully authorized George F. LeBus to sell and assign the lease, and he was at perfect liberty to do this without joinder on the part of his brother. And, since George F. LeBus decided to operate the lease rather than to sell or assign it, and he did so operate it, it is clear that in carrying out his purpose he did not purport to conduct the operations as an agent of any kind or character for his brother John. Had he so conducted the operations as an agent for John E. LeBus, it might be said that such brother was entitled to a part of the profits as a principal. Since he did not so conduct the operations as an agent, but conducted them as a principal, and as the sole principal, it could not be said that John E. LeBus was in relation to him as a partner in so far as such operations on the Mangold lease were concerned. 20 R.C.L., p. 826, sec. 31. There was no community interest based on, and growing out of, any combining of the brothers as associates for the purpose of carrying on any venture on the Mangold lease for their common benefit. As between the parties the requisite community interest essential to a partnership was never agreed upon. 68 C.J.S., Partnership, § 15, p. 423.

By process of elimination it is established that John E. LeBus' entitlement to any interest in the profits from the operations on the Mangold lease, if ever he actually was so entitled, was not founded in a partnership relation, but was founded in such as compensation for his services in securing the lease, and at the most the agreement between him and his brother was a mere "profit sharing agreement".

■ It is true that under and by virtue of such agreement, if it in fact was made, a trust relationship resulted once George F. LeBus received net profits over and above his expenses of operations and cost of acquisition, and he would hold one-fourth of such profits as the corpus of the trust

for John E. LeBus, as his cestui, and he would be obliged to deliver such profits held in trust over to his brother as in other trust relationships. Since appellees aver that none of such funds were ever paid to John E. LeBus, and appellant avers the same thing, but claims that George F. LeBus both acquired and retained such profits pursuant to fraud and further shows that John E. LeBus was ignorant of the fact and believed he was being paid his profits to the day of his death, the limitations plead by the appellees never started to run against him. At least they did not in so far as we view the proceedings on the summary judgment, where the record is void of any evidence on the question.

■ The judgment rendered by the trial court for the appellees was upon their motion for a summary judgment. Therefore, we must disregard conflicts in testimony, indulge in favor of the appellant every intendment reasonably deducible therefrom, and disregard all the evidence of the appellees in instances and respects where the credibility of the affiant or deponent testifying would be considered to be involved, and bearing all of such in mind determine if there are any issues of fact to be tried. Gulbenkian v. Penn, Sup.Ct.1952, 151 Tex. 412, 252 S.W.2d 929.

The appellees concede that in the event this court should be of the opinion that certain lease operations and accounting thereupon are involved in this case the cause should be remanded for a trial thereon. The properties in question are leases known as the Whitaker, Miller and Lewis Leases, and operations thereon jointly conducted in behalf of appellant and appellees. We are of the opinion that they are involved in the suit and that the cause will necessarily be remanded as to them.

■ However, the question posed upon that part of the judgment involving the Mangold lease and operations thereon and profits therefrom pose the material issue upon the appeal. It is noted that the appellant had in evidence an affidavit from T. Leo Moore, who was associated with George F. LeBus at the time he learned the desirability of the Mangold lease. This affidavit is to the effect that he was present when George F. LeBus promised John E. LeBus that "if he would secure said 400 acre lease, or any part thereof, at a price not to exceed $15.00 per acre, he would advance said purchase price, take the lease in his name and he would have the exclusive control and management of said lease to sell or develop for oil or gas, and that he would reimburse himself for the purchase price and would deduct 1/4th of all costs and expenses and would carry John E. LeBus 1/4th of all net profits received from said deal; * * *." The affidavit is further to the effect that he, the said T. Leo Moore, was a plaintiff in a certain lawsuit, Cause No. 31,928–B in the 78th District Court of Wichita County, Texas, in which George F. LeBus, John E. LeBus and R. H. LeBus were defendants, that by said suit he was suing to establish an interest in the Mangold lease and that said suit was settled by a compromise pursuant to which he took an assignment of an 80-acre interest in the Mangold lease, and that in connection with this settlement George F. LeBus wanted to execute said assignment to him, T. Leo Moore, without any other person executing it. That he, Moore, told George F. LeBus "he would have to get John E. LeBus to sign it, because I heard the deal between them and he was carrying John E. LeBus for 1/4th of the net profits in the Mangold 400 acre lease." The affidavit is further to the effect that George F. LeBus said in reply, "I know I am but it is in my name and John does not have to sign anything." The affidavit is further to the effect that as result of this conversation between Moore and George F. LeBus, LeBus did procure the signature of John E. LeBus to the assignment pursuant to the settlement of the lawsuit.

It is clear that from this evidence alone, whether or not we need to advert to evidence on the point, there is a fact issue which appellant is entitled to have tried under his pleadings through which procedure he may be able to obtain a fact finding to the effect that there was actually

a contract entered into between John E. LeBus, deceased, and George F. LeBus, performance under which was fully performed by John E. LeBus, as alleged in his pleadings.

By an instrument dated September 1, 1947, and acknowledged in statutory form as a quitclaim deed before a notary public on October 7, 1947, John E. LeBus first affirmed that he owned no interest in and to the Mangold lease and later on stated that he did thereby "release, discharge and quit claim unto Geo. F. LeBus, Roy H. LeBus, and the LeBus Oil Company, their heirs and assigns, any right, demand or claim in and to the two Mangold leases and the W. L. Hodges lease above described, or together with any other lease or leasehold interest, equitable or legal, in and to any lease held by the said Geo. F. LeBus, Roy H. LeBus, and/or LeBus Oil Company in Wichita County, Texas, * * * and does particularly release and quit claim any demand, claim or right, legal or equitable, in and to the two Mangold leases and the W. L. Hodges lease hereinabove described."

Appellant pleaded that on the date John E. LeBus signed the aforesaid instrument he did not know its contents and thought that his brother, George F. LeBus, was helping him; that John E. LeBus at that time was hard of hearing, his eyesight was weak, he was under the influence of intoxicating liquors and barbiturates, that his heart was affected, that he had dizzy spells, that he could not go to appellees' office in an elevator to sign such instrument, that John E. LeBus never read the instrument and could not have comprehended it if he had read it, and that it was prepared by the appellees and that the appellees, by false and fraudulent representations to said deceased, induced him to sign it. The pleading was sworn to by the appellant. Appellant, by a further affidavit which was a part of the record upon the summary judgment proceedings, swore that John E. LeBus, deceased, was his father, that his father died in November of 1952, and that there is a genuine issue of fact as to the

mental and physical condition of his father, especially during the last five years of his life, of which condition appellees were at all times fully aware, and that appellees took advantage of said mental and physical condition of the deceased to defraud him. The time to which affiant relates is not stated, but by reference to the sworn pleading already referred to in the first part of this paragraph, it would appear to relate to the incident of the deceased's execution of the quitclaim in the fall of 1947.

Since there was no evidence offered by the appellees of any form of proof upon the summary judgment proceeding relating to the mental capacity of John E. LeBus, deceased, upon the occasion of his execution of the quitclaim in the fall of 1947, we believe it to be plain that there is an issue of fact for the trier of fact upon the question of the intent and effect of the actions of the parties pursuant to and including the execution of the quitclaim.

The summary judgment rendered by the trial court is reversed and the cause remanded for a trial on the merits.

On Motion for Rehearing

In their motion for rehearing, appellees insist that George F. LeBus did not keep books on the Whitaker, Miller and Lewis lease operations until September 1, 1947, after which he did keep the books under specific arrangements with John E. LeBus. We do not believe such would affect our holding in this case. It was undisputed that George F. LeBus kept the books on the Mangold lease at all times.

Appellees further point out that the statutes of limitation would apply to claims for compensation for personal services and that in instances where they were performed under an oral contract, the compensation for any services which was over two years in arrears would be barred upon the interposition of the two-year statute, Vernon's Ann.Civ.St. art. 5526. Perhaps appellees have misunderstood our language. We do not intend to say the law is to the contrary. We hold only that

the statute does not bar the right to the compensation in instances where the person entitled thereto honestly believes he has received it from the person obligated to pay it and had no notice or knowledge to the contrary, when in fact he has not received it and the fact that he has not been paid was never brought to his knowledge, and where at the same time his erroneous belief was legally excusable.

Appellees point out that it is undisputed that since September 1, 1947, until November of 1952, the appellees performed under the contracts made September 1, 1947, and that as many as 60 times, or for as many months, John E. LeBus received and cashed the separate checks mailed to him in appellees' performance of the contracts. It is contended that John E. LeBus ratified the contracts under which the payments were made every time he received and cashed a check delivered to him under contractual provisions. Appellees insist that "nowhere does the Appellant by pleading or affidavit say that John E. LeBus was drunk or otherwise incompetent on the day he received and cashed the separate checks."

We have pointed out in our opinion the sworn allegations of the appellant to the effect that John E. LeBus was incompetent on the date of execution of the contracts of September 1, 1947, because he was at that time "hard of hearing, his eyesight was weak, he was under the influence of intoxicating liquors and barbiturates." We pointed out that appellant's sworn pleadings were to the effect that appellees took advantage of the mental and physical condition of the deceased to defraud him. In view of the assertions of appellees in their motion for rehearing, we reexamined the record. We find from the appellant's allegations that John E. LeBus was misled during the last five years of his life into believing that he was being paid the money he was entitled to receive under the agreement of October, 1937,—not only because of the fiduciary relationship existent between him and his brother and which was a premise of such mistaken belief prior to the last five years of his life—but additionally because during such five-year period he was mentally incompetent as result of an addiction to alcohol and drugs. The pleadings in this respect were mentioned but not emphasized in our original opinion. It was during this period that the contracts in question were executed, and that appellees' performance thereunder occurred. This covered the period during which each check was received and cashed.

It is indeed difficult to confine our views in this opinion to those views which we must take in light of the fact that the proceeding in the trial court was a summary proceeding. We have so confined ourselves. Appellant is entitled to get his evidence before a jury for its consideration. Whether the evidence would be sufficient to support any judgment rendered for appellant on the merits of his case upon an appeal thereof to an appellate court, or whether appellant's evidence might be so against the preponderance of all the evidence contrary thereto that it could not be supported on an appeal, is another question. Assuming on such an appeal that his judgment could not stand for either of such reasons, yet if there should be any evidence, this Court could never reverse and render such a judgment, but if so reversed, we would be compelled to remand the cause for another trial. For the same reasons we cannot affirm this summary judgment. There is some evidence. It presents material fact issues.

Motion for rehearing is overruled.