**ATLAS CORPORATION, a Delaware corporation, Plaintiff and Respondent,**

v.

**The CLOVIS NATIONAL BANK, The Citizens Bank of Clovis, National Growth Corporation, a Colorado corporation, et al., Defendants and Appellants.**

No. 19239.

Supreme Court of Utah.

April 28, 1987.

Steven D. Hull, Dale A. Kimball, Ronald G. Russell, Salt Lake City, Allen C. Dewey, Jr., Albuquerque, N.M., for defendants and appellants.

L. Robert Anderson, Lyle R. Anderson, Monticello, Stephen D. Alfers, William A. Hillhouse, David R. Hammond, Eliza C. Finkenstaedt, Denver, Colo., for plaintiff and respondent.

ZIMMERMAN, Justice:

Appellants The Clovis National Bank and The Citizens Bank of Clovis (jointly referred to as "Clovis") appeal from a summary judgment declaring that they have no

interest in certain uranium mining claims owned by respondent Atlas Corporation. Clovis asserts that the trial court erred in two respects: first, in ruling as a matter of law that the terms of an operating agreement and a sales agreement executed by the parties' predecessors in interest had terminated upon the completion of a "single mining venture" and, second, in ruling as a matter of law that the net profits interest created by those agreements was not an interest in land that survived the termination of the agreements. On the first issue, we reverse the trial court's ruling and resolve the issue as a matter of law in favor of Clovis. On the second issue, we also reverse the trial court, but remand the matter for further proceedings to determine by extrinsic evidence the intention of the parties.

In the late 1950s, one Abernathy and his two partners owned several unpatented uranium mining claims known as the Velvet and Royal Flush claims, covering approximately 700 acres in San Juan County, Utah. After some preliminary exploration, Abernathy and his partners agreed on April 18, 1957, to sell the claims to Kerr-McGee Industries, Inc., and Mercury Uranium & Oil Company. The parties signed both a sales agreement and an operating agreement that defined the parties' rights and obligations. A mining deed conveying the claims subject to the terms and conditions of the April 18th agreements was executed approximately two months later and recorded in San Juan County, Utah.

The crux of this action is the proper interpretation of the agreements and deed; therefore, a detailed discussion of the terms of each is required. Under the sales agreement, Abernathy and his partners conveyed to Kerr-McGee and Mercury all of their right, title, and interest in the Velvet and Royal Flush claims. In exchange, Abernathy and his partners received $100,000 in cash and 50,000 shares of Mercury stock valued at $1 per share. The sales agreement obligated Kerr-McGee and Mercury to "explore said claims with reasonable diligence" and, if commercially valuable ore was discovered, to "define and develop the ore body indicated" and to "mine, remove and sell such ore from said claims with reasonable diligence and reasonable continuity and in a good workmanlike manner...." The sales agreement then provided that, contingent upon the discovery and development of commercially valuable ore and after Kerr-McGee and Mercury had recovered certain costs and expenses detailed in the agreement, Abernathy and his partners would receive a forty percent share of "the net profits from all ores mined, produced and sold from said claims."

Contemporaneously with the execution of the sales agreement, the parties entered into an operating agreement which designated Kerr-McGee as operator. This operating agreement was incorporated into the sales agreement by reference. The provisions of the operating agreement were consistent with those of the sales agreement. It recited that Abernathy and his partners had "reserved unto themselves an undivided net profits interest ... in and to the net profits from all ores mined, saved, removed and sold from said claims ..." and went on to define the net profits interest and describe its calculation as it had been defined and described in the sales agreement. Also, just as in the sales agreement, the operating agreement obligated Kerr-McGee to diligently explore and develop "said claims." The operating agreement contained additional specific provisions detailing the methods for defining and developing any ore body, for abandoning any mine, and for allowing any claim to expire. In the event that such an abandonment or expiration were contemplated, Abernathy and his partners were granted an option to reacquire any mine or claim.

The operating agreement allowed both Kerr-McGee and Mercury to transfer their interests, subject to a right of first refusal in favor of the other. It then expressly provided that "[a]ll sales made by either [Kerr-McGee] or Mercury or their respective successors in interest shall be subject to the terms, covenants, and conditions of [the agreement]," which were declared to be covenants running with the land and the mineral estate. The agreement was

deemed to be binding upon the parties, their heirs, successors, and assigns and was to be "in full force and effect so long as any of the [subject] mining claims ... are in force and effect."

The mineral deed, executed two months later, did not expressly reserve or except a net profits interest in favor of Abernathy and his partners. Instead, it stated only that the conveyance was made "subject to the terms, covenants and conditions contained in [the sales and operating] agreement[s] ... between the parties."

The trial court found that after the agreements were executed, Kerr-McGee "commenced with reasonable diligence and diligently prosecuted exploration and other activities sufficient in [its] ... opinion ... to test the lands covered by the [subject claims] for the presence of commercial ore deposits. In this exploration work, [Kerr-McGee] discovered commercial ore and proceeded to define the ore body indicated thereby." The discovery of that ore body resulted in the development in 1958 of the seven-acre Bardon Mine. The Bardon Mine was worked for about three years.

In December of 1960, Kerr-McGee abandoned the Bardon Mine in accordance with the terms of the agreements. Neither Abernathy nor his partners exercised their option to reacquire the claims located on the seven acres involved in the Bardon Mine when Kerr-McGee abandoned the property. In 1967, Clovis acquired Abernathy's interest under the sales agreement.

For reasons not clear from the record, Kerr-McGee did not develop further the other property covered by the claims. Atlas asserts that "Kerr-McGee performed additional exploration activity in an unsuccessful attempt to discover another commercial ore body," while Clovis claims that "Kerr-McGee intended to conduct further exploration and mining ... [but its] planned operations were stalled by the commencement of litigation seeking an accounting of the proceeds from the Bardon

[Mine]."[1] The trial court's factual findings do not resolve this issue.

Through various conveyances, Atlas acquired the claims in 1977. In 1978, Atlas began developing the Velvet Mine. The Velvet ore body, one of the richest in the Colorado Plateau, is distinct from the ore body tapped by the Bardon Mine.

In 1979, Atlas instituted this action to quiet title to the claims. In December of 1982, Clovis moved for summary judgment, seeking a declaration that the net profits interest described in the 1957 agreements was a real property interest of perpetual duration and binding upon Atlas, that Atlas purchased the property with notice that the claims were encumbered by that interest, and that Clovis owned a 14.07 percent interest in the net profits from all the ores mined, produced, and sold in the development of the claims. The district court denied Clovis's motion.

Shortly thereafter, Atlas filed a motion for summary judgment, contending that the net profits interest created by the agreements was a personal covenant between Abernathy, his partners, Kerr-McGee, and Mercury and therefore was not binding on Atlas. Atlas also argued that the agreements contemplated only a single mining venture—that venture being the development of the Bardon Mine—and that since the Bardon Mine had been abandoned, the agreements had expired. In response, Clovis renewed its earlier-denied motion for summary judgment.

After a hearing, the trial court entered an order granting summary judgment in favor of Atlas on two grounds: First, the court held that the agreements contemplated only a single mining venture and that all rights and obligations under the agreements had therefore terminated upon the abandonment of the Bardon Mine. Second, the court held that the net profits interest was a contractual profit-sharing arrangement, rather than an interest in land or a covenant running with the land, and had therefore expired when the operat-

---

**1.** That case was *Yucca Mining & Petroleum Co. v. Kerr-McGee Oil Industries, Inc.*, Civ. No. 1939 (Seventh Jud. Dist., San Juan County, Utah, filed Sept. 9, 1968). The *Yucca* case took over eight years to resolve.

ing agreement terminated. Clovis filed this appeal, challenging both of the trial court's conclusions.

In considering Clovis's appeal, it is important to note the appropriate standard of review. Because disposition of a case by summary judgment denies the benefit of a trial on the merits, we will review the facts and inferences in the light most favorable to the party against whom the judgment was granted. *Young v. Texas Co.*, 8 Utah 2d 206, 331 P.2d 1099 (1958); *Durham v. Margetts*, 571 P.2d 1332, 1334 (Utah 1977). If, when so considerred, we conclude that there is a dispute as to a genuine issue of material fact, we must reverse the grant of summary judgment and remand for trial on that issue. *Thornock v. Cook*, 604 P.2d 934, 936 (Utah 1979); *see* Utah R.Civ.P. 56(c). In addition, because a summary judgment is granted as a matter of law rather than fact, we are free to reappraise the trial court's legal conclusions. *Betenson v. Call Auto Equipment & Sales, Inc.*, 645 P.2d 684, 686 (Utah 1982); *Morris v. Mountain States Telephone & Telegraph Co.*, 658 P.2d 1199, 1200–01 (Utah 1983).

■■■ The cardinal rule in construing any contract must be to give effect to the intentions of the parties. If possible, those intentions must be determined from an examination of the text of the agreements. *DuBois v. Nye*, 584 P.2d 823 (Utah 1978); *Oberhansly v. Earle*, 572 P.2d 1384 (Utah 1977). And, inasmuch as the agreements and the mining deed were executed substantially contemporaneously and are clearly interrelated, they must be construed as a whole and harmonized, if possible. *Mark Steel Corp. v. EIMCO Corp.*, 548 P.2d 892 (Utah 1976). If the contract language is ambiguous or uncertain after careful consideration of the whole integration, only then should a court consider extrinsic evidence to determine the parties' intent. *Big Butte Ranch, Inc. v. Holm*, 570 P.2d 690 (Utah 1977).

The first issue on appeal is whether the trial court was correct in concluding as a matter of law, based on the terms of the contracts only, that Kerr-McGee's obligations under the agreements were limited to a single mining venture. It is this conclusion that led the trial court to hold that when the Bardon Mine was developed and subsequently abandoned, the agreements had been fully performed and the parties' obligations terminated. In reaching this conclusion as to the intentions of the parties, the trial court relied heavily upon the fact that Kerr-McGee had a number of obligations under the operating agreement, all of which were contingent. Kerr-McGee was obligated to explore the claims for ore; but if no ore was found, it would have no further obligations and the agreements would terminate. If ore was found, Kerr-McGee was required to define and develop it; but if the ore was not present in commercially valuable quantities, it had no further obligations. If ore in commercial quantities was thereafter mined at the rate defined in the agreement and if certain development costs were recovered, Kerr-McGee was obliged to calculate and disburse net profits as provided in the agreement; but if insufficient ore was mined or if Kerr-McGee failed to recover its costs, no obligation to share net profits arose. The court reasoned that the parties could only have contemplated that Kerr-McGee go through this cycle once.

In support of the trial court's interpretation, Atlas asserts that any other construction would be manifestly unreasonable because it would require Kerr-McGee (or Atlas, as its successor) to "embark on a perpetual mining venture with endless obligations to explore, develop, mine, wind up, render accounting and then explore again, ad infinitum." Atlas contends that the trial court reached the only reasonable construction of the principal operative terms of the agreements and that those terms override the rather peripheral, somewhat-inconsistent suggestions in the first and last paragraphs of the agreements that the parties' obligations were to last as long as the claims remained valid. As for the language in the agreements stating that the parties would share the net profits from "all ores" produced from the claims, Atlas contends that a reasonable construction of that language is that it referred only to net profits from all *kinds* of ore discovered

during the single mining venture, not all ores that might ever be produced from the claims in perpetuity.

Clovis argues that the trial court's conclusion that the agreements have terminated is at odds with their unambiguous terms of the agreements, which state that they were to remain in effect so long as the claims were valid. Moreover, Clovis asserts that construing the agreements as limited to the development of a single ore body or a "single mining venture" assumes that the parties intended to encourage the operator to act in bad faith in developing the claims, for under such a construction, an operator could conduct limited exploration and develop only the first ore body discovered, or it could explore all of the claims and then develop only the smallest ore body, and in either event cut off substantial rights of the grantors and retain for itself the rights to most of the minerals on the claims.

We agree with Clovis that the trial court's interpretation of the contract language is strained and cannot stand. It is simply inconsistent with too much of the language of the agreements and produces an unjust result. It strains reason to conclude that the parties intended the agreements to terminate once Kerr-McGee had explored and developed one percent of the property covered by the claims. As Clovis points out, such a holding would encourage fraudulent activity by operators, something the parties cannot be deemed to have intended in the absence of plain language to the contrary. *See Wingets, Inc. v. Bitters*, 28 Utah 2d 231, 500 P.2d 1007 (1972); *Continental Bank & Trust Co. v. Stewart*, 4 Utah 2d 228, 291 P.2d 890 (1955); *Cummings v. Nielson*, 42 Utah 157, 129 P. 619 (1913).

It is clear from the agreements that the parties' overall purpose was to facilitate the exploration and development of *any* commercially valuable deposits of uranium ore on the Velvet and Royal Flush claims. The agreements bound Kerr-McGee and its successors to explore "said claims" with reasonable diligence and to develop any commercially valuable ore upon those claims. Giving the words "said claims" their ordinary meaning, *Commercial Building Corp. v. Blair*, 565 P.2d 776, 778 (Utah 1977), the agreements reasonably must be considered as referring to the entire area of the claims, which cover approximately seven hundred acres. In light of this language, it is very difficult to find that the parties intended that the obligations to explore and develop would expire upon the discovery and development of any ore on any part of the property. For the same reason, we cannot accept Atlas's argument that the term requiring the parties to share net profits derived from "all ores" means "all kinds of ore" found at the single mining venture. Considered in its ordinary sense, the term "all ores" refers to all ores mined from all the claims.

Thus, the trial court's conclusion that the parties contemplated only a "single mining venture" consisting of a single, discrete operation is incompatible with the overall purpose of the agreements. We conclude that the parties contemplated that Kerr-McGee would embark upon a mining venture, including complete exploration of the claims and development of ore deposits where required. We also conclude that the terms of the agreements were intended to apply to all such operations regardless of whether Kerr-McGee chose to develop the claims piecemeal or in a single mammoth operation.

Contrary to the reasoning of the trial court and the arguments of Atlas, the fact that Kerr-McGee's development obligations were contingent upon the discovery of commercially valuable ore is not indicative of any intent to limit its production obligations to a single ore body. The contingent nature of the obligation reflects only the simple reality that no obligation to produce an indicated mineralization or to share net profits could arise unless commercially valuable ore was discovered and produced and, after production, net profits were realized. And nothing whatsoever in the agreements suggested that Kerr-McGee's obligation to explore the claims was contingent. The only reasonable, common-sense reading of the agreements is that they

would terminate through performance only when Kerr-McGee had *fully* performed by reasonably and diligently exploring, developing, and if warranted, producing all the claims.

In light of the interpretation we give the agreements, Kerr-McGee's abandonment of the Bardon Mine is no indication that its exploration, development, and production obligations respecting the rest of the property were fully performed. We do not suggest that Kerr-McGee or its successors have an endless obligation to reexplore and redevelop the claims. Rather, we find that the purpose and plain language of the agreements compels the conclusion that as a matter of law, the agreements were to remain in effect until Kerr-McGee or its successors in interest had fully performed its exploration, development, and production obligations with respect to all the claims. The trial court's contrary conclusion must be reversed. It may be that on remand, Atlas can establish as a matter of fact that the obligation to diligently explore, develop, and produce the claims has been performed and that the agreements therefore have terminated. That factual issue, however, cannot be resolved on the record before us.

The second issue Clovis presents on appeal is whether the trial court was correct in determining as a matter of law that the net profits interest created by the agreements was merely a contractual right, rather than a perpetual independent interest in land. In light of our ruling that the agreements did not terminate as a matter of law upon the abandonment of the Bardon Mine, we need not resolve this issue. However, on remand the trial court may determine as a matter of fact that the agreements have terminated. If that occurs, then the issue Clovis raises will be ripe. In the interest of judicial economy and to guide the trial court should it consider this question, the following discussion is appropriate. *E.g.,*

*Salt Lake County v. Salt Lake City*, 570 P.2d 119, 121 n. 10 (Utah 1977).

A net profits interest has been defined as "[a] share of gross production from a property, measured by net profits from operation of the property [and] . . . carved out of a working interest." 2 H. Williams & C. Meyers, *Manual of Oil & Gas Terms* 457 (1982). Clovis first asserts that the term "net profits interest" is a term of art in the mineral industry that defines an independent estate in land. As an estate in land, Clovis argues, the net profits interest created by the agreements will survive the termination of the underlying agreements that created it. Therefore, even if the agreements have been terminated by performance, Clovis's interest survives. Clovis also argues that even if the words "net profits interest" are not sufficient to make estates in land of all interests so described, the net profits interest created by the agreements here in issue is sufficiently analogous to a royalty and a working interest to be considered, like them, an estate in land. In reply, Atlas argues that net profits interests are generally contractual interests, rather than independent estates in land, and that the interest created by the present agreements therefore cannot survive the contract that created it.

■ We are not persuaded that the issue can be decided as a matter of law upon the record before us. We do not agree with Clovis that the term "net profits interest" has acquired a fixed and immutable meaning such that all interests so formed automatically are entitled to treatment as estates in land. There is no body of law that clearly defines the nature and incidents of the net profits interest. Because the term "net profits interest" has no uniform meaning, we believe that "the nature of the [net profits] interest and the rights of its owner must be determined from the provisions of the instrument which created it." 5 E. Kuntz, *A Treatise on the Law of Oil & Gas* § 63.5 (1978).[2] *See Christy v. Petrol*

**2.** Atlas relies heavily on *LeBus v. LeBus,* 269 S.W.2d 506 (Tex.Civ.App.1954), to argue that a net profits interest is a contractual right and not an interest in land. There the Texas appeals court did hold that a net profits interest was merely a contractual profit-sharing agreement. However, *LeBus* is not strong authority, as Atlas would have us believe.

First, *LeBus* is distinguishable on its facts. Two brothers, John and George LeBus, were

*Resources Corp.,* 102 N.M. 58, 691 P.2d 59, 62 (App.1984).

 In the instant case, whether the net profits interest created by the agreements amounted to an estate in land or a contractual right cannot be ascertained from the four corners of the instruments. For example, it is true, as Atlas argues, that the precise terms of the interest at issue are set out not in the deed, but in one of the contracts.[3] On the other hand, the agreements indicate that the parties intended to create a broad net profits interest applicable to *"all* ores mined from said claims" and effective so long as the claims are valid. This suggests an interest that would continue to exist independent of the agreements. Also, the agreements referred to the net profits interest as a covenant running with the land, rather than a mere contractual interest. Over all, the documents are ambiguous concerning the nature and duration of the net profits interest, and they raise a factual issue as to the parties' intent. If the trial court finds on remand that the agreements have terminated, it should then proceed to determine the parties' intent regarding the net profits interest following a full airing of the facts.

Reversed and remanded for further proceedings consistent with this opinion.

HALL, C.J., and HOWE and DURHAM, JJ., concur.

STEWART, Associate C.J., concurs in the result.

---

partners owning several oil properties. In consideration for John's work in procuring an oil and gas lease for George, George promised John certain periodic payments from the net profits on the lease. The court in *LeBus* found that where John's interest did not derive from ownership but was merely compensation for services rendered, the interest created was merely a contractual profit-sharing agreement, not an interest in land. In the present case, the interest of Clovis derives from mineral ownership, not a mere right to compensation.

In addition, cases and secondary authorities considering the nature of a net profits interest subsequent to the *LeBus* decision have noted that under appropriate circumstances, such an interest should be considered an interest in land, *see T–Vestco Litt-Vada v. Lu-Cal One Oil Co.,* 651 S.W.2d 284 (Tex.Civ.Ap.1983) (citing 2 H. Williams & C. Meyers, *Oil & Gas Law* § 424.1 (1981)), or have assumed without deciding that a net profits interest is an interest in land, *see, e.g., Carlock v. National Co-op Refinery Association,* 424 F.2d 148 (10th Cir.1970); *cf.*

*Parker v. Petro Lewis Corp.,* 663 S.W.2d 905 (Tex.Civ.App.1983).

3. We do not find persuasive Atlas's assertion that, as a legal matter, no interest in land was created because the deed was made "subject to" the agreements, rather than utilizing terms of reservation or exception. Ordinarily, the use of the words "subject to" does not indicate a grant or reservation. However, in this case, the term "subject to" limited the estate granted in accordance with the agreements, which expressly reserved to Abernathy and his partners the net profits interest. As a qualifying term, the agreements reserving the net profits interest were incorporated into the deed. *See Cockrell v. Texas Gulf Sulphur Co.,* 157 Tex. 10, 16, 299 S.W.2d 672, 676 (Texas 1956) (use of "subject to" in deed incorporated leases and defined the nature, extent, and character of estate granted); *cf. Hendrickson v. Freericks,* 620 P.2d 205 (Alaska 1980). Therefore, the use of the term "subject to" is not alone sufficient to persuade us that no interest in land was created.