**VALLEY BANK AND TRUST COMPANY, a Utah corporation, Plaintiff,**

v.

**RITE WAY CONCRETE FORMING, INC., a Utah corporation, Peter Lowe, Jr., J. Randall Outsen, Tracy M. Jones, Richard H. Lowe, and Don Bailey Construction, Inc., a Utah corporation, Defendants.**

**Peter LOWE, Jr., and Richard H. Lowe, Cross-Complainants, Third-Party Plaintiffs and Appellants,**

v.

**DON BAILEY CONSTRUCTION, INC., a Utah corporation, Cross-Defendants and Respondents,**

**and**

**Don Bailey, Draper Bank, a Utah corporation, and Jacobsen-Robbins Construction Company, Inc., a Utah corporation, Third-Party Defendants.**

**No. 860018–CA.**

Court of Appeals of Utah.

Sept. 1, 1987.

Arthur H. Nielsen, Richard Hincks, Nielsen & Senior, Salt Lake City, for Jacobsen-Robbins Const. Co.

Dwight L. King, Salt Lake City, for Draper Bank and Trust.

Arthur F. Sandack, Salt Lake City, for Tracy Jones.

K.L. McIff, Jackson, McIff & Mower, Richfield, for Peter M. Lowe, Jr. and Richard H. Lowe.

Paul D. Veasy, W. Jeffery Fillmore, Biele, Haslam & Hatch, Salt Lake City, for Valley Bank and Trust Co.

Before ORME, DAVIDSON and GARFF, JJ.

GARFF, Judge:

Defendants Peter Lowe, Jr. and Richard H. Lowe appeal from a summary judgment in favor of plaintiff Valley Bank and Trust (Bank) finding defendants liable as guarantors of a promissory note executed by Rite Way Concrete Forming, Inc. (Rite Way) and awarding plaintiff attorney fees. We remand for hearing consistent with this opinion.

Rite Way executed a promissory note for $15,000.00 at 12.75% interest per annum in favor of the Bank for the purpose of purchasing concrete forming equipment from Conesco, a concrete forming equipment supplier. This note was secured by collateral consisting of the concrete forming equipment and a 1977 Chevrolet two-ton flat-bed truck, and by the personal guarantees of several persons, including Peter and Richard Lowe.

After execution of the note and the security agreements, the Lowes conveyed all of their interest in Rite Way to Don Bailey Construction, Inc. (Bailey), which assumed the $15,000.00 obligation to the Bank. In connection with this transaction, Rite Way transferred ownership of the flat-bed truck and the cement forming equipment to Bailey, which subsequently subcontracted to do work for Jacobsen-Robbins Construction Co., a general contractor. Upon Bailey's failure to satisfactorily complete the subcontract, it surrendered the secured equipment to Jacobsen-Robbins and defaulted on the loan obligation to the Bank. Upon Bailey's default, the Bank sued and entered default judgment against it. However, Don Bailey, the corporate owner, disappeared and the corporation ceased doing business without satisfying the debt.

The Bank then accelerated the note and demanded that the Lowes pay the entire balance of $4,494.71 because of their personal guaranties. The Lowes refused to pay the balance, but, instead, met with Bank officers and offered to locate the collateral and assist with its repossession. They spent a considerable amount of time and effort doing so, and allege that they succeeded in locating virtually all of the secured equipment on the Jacobsen-Robbins job sites. They also assert that they gave the Bank a specific description of the equipment and its location, and authorized the Bank to repossess it. For purposes of reviewing this summary judgment, we review the facts and inferences in the light most favorable to the Lowes. *Atlas Corp. v. Clovis Nat'l Bank*, 737 P.2d 225, 229 (Utah 1987).

Although the Bank never acquired actual physical control over the collateral, it is unclear whether it had the opportunity or the right to do so. On October 12, 1982, without the Lowes' awareness or consent, and reserving its rights against Rite Way,[1] the Bank released its interest in the cement forms in Jacobsen-Robbins' possession after Jacobsen-Robbins notified the Bank that Conesco claimed ownership of the

forms. Under the summary judgment standard of review, we assume the truthfulness of the Lowes' statement that these cement forms were substantially the same equipment described in the security agreement. As a consequence of this release, the Bank was unable to satisfy the loan balance from the collateral.

The Bank brought a successful motion for summary judgment against the Lowes. The trial court in a memorandum decision found that the Lowes' guaranty was absolute and unconditional because it provided that the guarantors "severally *guarantee payment* when due of any and all obligations of Borrowers to Bank when due or any and all obligations of Borrower to Bank now existing or which may hereafter arise of whatsoever nature and however represented, and *whether secured or unsecured*" (emphasis in original).

The trial court entered judgment in favor of the Bank for $4,494.71 principal, $1,884.78 interest, $2,800.00 attorneys' fees, and $51.50 court costs.

The Lowes raise the following issues on appeal: (1) In releasing the collateral, did the Bank discharge the Lowes from their guaranty agreements? (2) Was the award of attorney fees against the Lowes improper?

## I.

The first issue is whether the Lowes were discharged from their guaranty agreements when the Bank released the collateral securing the loan.

Whether a creditor has a duty to pursue the debtor or the collateral securing the loan as a precondition to pursuing the guarantor depends "on the nature of the guarantor's promise." *Strevell-Paterson Co. v. Francis*, 646 P.2d 741, 743 (Utah 1982) (quoting *Westinghouse Credit Corp. v. Hydroswift Corp.*, 528 P.2d 156, 158 (Utah 1974)).

The nature of the guarantor's promise depends upon whether it is absolute or

---

1. The Bank's release stated that "[b]y disclaiming any interest in and to the forms set forth as described herein, Valley Bank and Trust Company does not release or waive any right under its Security Interest and Financing Statement with Rite-Way Concrete Forming, Inc., Debtor, ..."

conditional. An absolute guaranty is defined as:

a contract by which the guarantor has promised that if the debtor does not perform his obligation or obligations, the guarantor will perform some act (such as the payment of money) to or for the benefit of the creditor.... A guaranty of the payment of an obligation, without words of limitation or condition, is construed as an absolute or unconditional guaranty.

38 Am.Jur.2d *Guaranty* § 21 (1968). This unconditional obligation, sometimes referred to as a guaranty of payment, holds the guarantor liable, without notice, upon the default of the principal. *Mack Fin. Corp. v. Scott*, 100 Idaho 889, 606 P.2d 993, 998 (1980). Such a guaranty is "absolute, and the guaranteed party need not fix its losses by pursuing its remedies against the debtor or the security before proceeding directly against the guarantor." *Strevell-Paterson Co. v. Francis*, 646 P.2d at 743.

On the other hand, a conditional guaranty, or guaranty of collection, is an obligation to pay or perform if payment or performance cannot be first reasonably obtained from the principal obligor. *Id.*

The Utah Supreme Court, in *Strevell-Paterson*, found that the guaranty contract at issue was an absolute guaranty of payment rather than a guaranty of collection, because it "contained no express or implied condition on liability and no contractual requirement that the creditor seek satisfaction elsewhere before commencing action on the guarantee." *Id.* at 743–44.

■ Likewise, the present guaranty contract contains language that indicates that it is an absolute guaranty of payment rather than only a guaranty of collection:

"VALLEY BANK AND TRUST COMPANY," a corporation, hereinafter referred to as "Bank", has extended credit and/or agreed to extend credit and/or furnished or agreed to furnish other accomodations to the person hereinafter identified as "Borrower", and the undersigned Guarantors, in consideration of such credit and/or accomodations by Bank to Borrower jointly and severally

guarantee payment when due of any and all obligations of Borrower to Bank now existing or which may hereafter arise of whatsoever nature and however represented, and whether secured or unsecured (emphasis added).

As in *Strevell-Paterson*, there are no additional clauses stating an "express or implied condition on liability," nor is there a contractual requirement that the creditor seek satisfaction elsewhere on the guaranty. *See Strevell-Paterson*, 646 P.2d at 744. Therefore, the Lowes' liability for the loan became fixed upon the default of the primary obligor, Don Bailey.

■ However, a guarantor, upon payment of the guaranteed obligation, has a right of subrogation to any collateral pledged as security. *Behlen Mfg. Co. v. First National Bank*, 28 Colo.App. 300, 472 P.2d 703, 706 (1970); *D.W. Jaquays & Co. v. First Security Bank*, 101 Ariz. 301, 419 P.2d 85, 89 (1966). This is true even of an absolute guarantor. This right to subrogation is a "creature of equity," whose "purpose is the prevention of injustice and is the mode which equity adopts to compel the ultimate payment of a debt by one who in justice, equity, and good conscience ought to pay it." *Behlen Mfg. Co.*, 472 P.2d at 707 (quoting *D.W. Jaquays & Co.*, 419 P.2d at 88). The rationale is that the creditor, having elected to proceed against security for payment of the debt, is deemed to be in a trustee relationship with the guarantor. The creditor may liquidate the security and apply the proceeds to the obligation, or he may forego recourse to the security and proceed against the guarantor of payment, provided he does not subvert the guarantor's subrogation rights against collateral pledged by the principal obligor. If he breaches that trust duty by destroying, losing, or otherwise improvidently dissipating the collateral, he may not hold the guarantor wholly liable because the guarantor would have been subrogated to the creditor's right of resort to that security. 38 Am.Jur.2d *Guaranty* § 84 (1968). Thus, where a creditor's actions impair the value of collateral in its possession which secures an obligation guaranteed by a

guarantor, either absolute or conditional, the guarantor will be discharged from his obligation to the extent of the impairment. *Mack Fin. Corp. v. Scott,* 606 P.2d at 998.

This general rule has been codified in Utah through the Uniform Commercial Code. Utah Code Ann. § 70A–3–606(1)(1980) states:

> The holder discharges any party to the instrument to the extent that without such party's consent the holder ... (b) unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse.

Appellants rely on this general rule to support their argument that they should escape liability on their guaranty contracts because the Bank's release of the collateral was unjustified.

However, as an exception to this general rule, an absolute guarantor may explicitly waive his rights against collateral. Under the language of Section 70A–3–606(1)(b), the holder does not discharge a party to the instrument if the party consents to allow the holder to impair the collateral. Thus, a finding that the guarantors so consented renders Section 3–606 discharge unavailable even if the holder unjustifiably impairs the collateral. The Official Comment to Section 3–606 of the Uniform Commercial Code indicates that such consent may be given in advance in the guaranty agreement:

> Consent may be given in advance, and is commonly incorporated in the instrument. It requires no consideration, and operates as a waiver of the consenting party's right to claim his own discharge.

*See also National Acceptance Co. of America v. Demes,* 446 F.Supp. 388, 390 (D.Ill.1977).

Such consent must be explicit and "should only be by the most unequivocal language in the guaranty agreement." *Behlen Mfg. Co.,* 472 P.2d at 708 (quoting

*D.W. Jaquays & Co.,* 419 P.2d at 89); *See also Mack Fin. Corp.,* 606 P.2d at 1000.

For example, an explicit contract was found in *Joe Heaston Tractor & Implement Co. v. Sec. Acceptance Corp.,* 243 F.2d 196, 198 n. 1 (10th Cir.1957):

> The undersigned grants to the Finance Company full power to modify or change terms of any of the Liabilities, to agree to forbearance with respect thereto, to consent to the substitution or exchange or release of collateral thereto, and extension of time of payment of the Liabilities.

Likewise, the guaranty agreement in *National Acceptance Co. of America v. Demes,* 446 F.Supp. at 390, was found to be an unequivocal waiver of rights against collateral.

> The undersigned hereby waive notice of the following events or occurrences: ... the holder's obtaining, amending, substituting or releasing, waiving, or modifying any ... security interests, liens, or encumbrances; [or] ... the holder's ... hereafter accepting ... any collateral securing the payment ... or said holder's settling, subordinating, compromising, discharging, or releasing the same. The undersigned agree that the holder of the Note may ... do any or all of the foregoing events or occurrences in such manner, upon such terms and at such times as said holder, in its sole and absolute discretion, deems advisable, without in any way or respect impairing, affecting, reducing, or releasing the undersigned from their obligations hereunder....

*Id. See also Schauss v. Garner,* 590 P.2d 1316 (Wyo.1979).

In contrast, the court in *Behlen Mfg. Co.* found that language in the guaranty agreement[2] did not meet this test because "the only waiver in the guaranty agreement [had] to do with notice of nonpayment, protest, extension of the note and partial payment. *There [was] no waiver relating to the collateral.* The indemnity agree-

---

**2.** The specific provisions in the guaranty agreement were as follows: Behlen agreed "to fully indemnify and save the Bank harmless against all expense, loss, damage or injury arising in connection with the above note, or in the acceptance of any collateral therefor, or which may be incurred in enforcing collection of the same...." *Behlen Mfg. Co.,* 472 P.2d at 706.

ment is limited to expense, loss or damage incurred in accepting the collateral or incurred in enforcing collection." *Id.*, 472 P.2d at 708, (emphasis added). *See also Mack Fin. Corp. v. Scott*, 100 Idaho 889, 606 P.2d 993, 1000 (1980).

Similarly, the Arizona court, in *Jaquays*, found that guarantors' subrogation rights were not impaired because consent to impair the collateral was not explicitly given, stating that the following language was insufficient to constitute an unequivocal waiver of rights against the collateral: "and in connection therewith consents without notice to any extensions or forbearance by assignee, and waives any demand or notice of default." *Jaquays*, 419 P.2d at 88.

■ In the present case, there are no explicit waivers of rights against collateral in the Lowes' guaranty agreements. The only language which could be remotely construed to be a waiver of rights against collateral states that the Lowes "jointly and severally guarantee payment when due of any and all obligations of Borrower to Bank now existing or which may hereafter arise of whatsoever nature and however represented, whether secured or unsecured."

In interpreting this language, we recognize that an instrument purporting to establish liability against a guarantor must be construed strictly, and any ambiguities must be resolved against the drafter of the instrument. *National Acceptance Co. of America v. Demes*, 446 F.Supp at 391. This present language deals with the guarantors' liability for any loans made to the debtor, whether secured or unsecured, not with any waiver relating to collateral. Construed strictly against the Bank, it does not explicitly waive any subrogation rights to collateral.

Therefore, assuming the Bank had control over the collateral, as the Lowes contend, we conclude that it had a duty to preserve the Lowes' interest in the property held as security and that performance of this duty was not waived by the Lowes' unconditional guaranties because the Lowes did not expressly consent to impairment of the collateral. *See Jaquays*, 419 P.2d at 89.

■ Whether the Lowes can prevail, however, depends upon two factors: If the forms which the Lowes found were the actual collateral and, if so, whether the Bank had control over them.[3] Further, a guarantor is released from his liability only to the extent of the injury caused by the failure of the creditor to protect his security interest, if the creditor was in control of the property held as security. Utah Code Ann. § 70A–3–606(1) (1980); *see Jaquays*, 419 P.2d at 89; *Mack Fin. Corp. v. Scott*, 606 P.2d at 998.

Since there are genuine issues of material fact as to whether the Bank had control over the collateral and whether the forms released by the Bank were, in fact, the collateral securing the note guaranteed by the Lowes, the summary judgment must be set aside. *Atlas*, 737 P.2d at 229. This conclusion renders any discussion concerning disposition of the collateral in a commercially reasonable manner unnecessary.

## II.

The second issue raised by appellants was whether the award of $2,800 in attorney fees was proper. It is undisputed that the Lowes were liable for attorney fees.[4] What is at issue is the amount of the fee.

On February 24, 1984, Veasy, the Bank's counsel, filed an affidavit in support of attorney fees with the court, but failed to

---

**3.** The Bank conceded, for purposes of this appeal only, that it had such control. Our decision in no way precludes the Bank from proving at trial that it, in fact, had no such control.

**4.** The relevant portion of the loan contract states, "[a]ll costs and expenses of Bank, in retaking, holding, preparing for sale and selling or otherwise realizing upon the collateral in the event of default by Borrower, including court

costs and reasonable attorney's fees and legal expenses, shall constitute additional indebtedness of the Borrower secured hereby which the borrower promises to pay on demand." The Guaranty agreement is in accord: "Each Guarantor agrees to pay all costs and expenses, including reasonable attorney's fees incurred in enforcing this agreement."

serve a copy on McIff, counsel for the Lowes. McIff received, on Feb. 27, 1984, a copy of the proposed judgment from Veasy which indicated that the Lowes were liable for $2,800.00 in attorney fees. He called Veasy that day to inform him of the lack of affidavits or documentation supporting the award of attorney fees and, on Feb. 28, 1984, filed an affidavit alleging that the attorney fee award was excessive and the supporting affidavit was not timely filed.

The trial court entered judgment on March 5, 1984, for $4,494.71 principal, $1,884.78 interest, $2,800.00 attorney fees, and $51.50 court costs. McIff stated that he finally received a copy of the affidavit in support of attorney fees on March 7, 1984, and, on the same day, filed a motion in opposition to plaintiff's affidavit in support of attorney fees. On April 4, 1984, McIff filed an affidavit in which he brought these facts again to the court's attention.

■ The Utah Supreme Court has stated that "[e]ven if there were no disputed issue of material fact, the summary judgment cannot award an attorney's fee without a stipulation as to the amount, an unrebutted affidavit, or evidence given as to the value thereof." *Freed Fin. Co. v. Stoker Motor Co.*, 537 P.2d 1039, 1040 (Utah 1975). In the instant case, there was not only a lapse of due process in that judgment was entered before appellant had an opportunity to see and respond to respondent's affidavit on attorney fees, but appellants rebutted respondent's affidavit. Accordingly, the award of attorney fees was improper. Since the judgment appealed from is reversed, the award of attorney fees falls as well, and fresh consideration of the attorney fee question will, of course, be appropriate.

Reversed and remanded for trial consistent with this opinion.

DAVIDSON and ORME, JJ., concur.